ORAL ARGUMENT NOT YET SCHEDULED

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

### No.s 13-3051 and 13-3054

_____

### UNITED STATES OF AMERICA, Appellee

v.

### AURELIO CANO-FLORES, Appellant

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case No. 08-057 (BJR)

_____

# BRIEF FOR APPELLANT

Richard K. Gilbert
LAW OFFICE OF RICHARD K. GILBERT
601 Pennsylvania Avenue N.W.
Suite 900 South Building
Washington, D.C. 20004
(202) 898-0857
rkgesq@juno.com

Kristen Grim Hughes
LAW OFFICE OF KRISTEN GRIM HUGHES
1390 Chain Bridge Road, #530
McLean, Virginia 22101
(703) 798-4444
kghughes@hotmail.com

*Counsel for Aurelio Cano-Flores*
(Appointed by the Court)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A)     Parties and Amici.**

The parties appearing in the lower court and this appeal are Defendant-Appellant Aurelio Cano-Flores and Plaintiff-Appellee United States of America. Undersigned counsel are unaware of any *amici curiae*.

**(B)  Rulings Under Review.**

Cano-Flores appeals the judgment of conviction, the sentence imposed [Doc.172, amended 177] and the final order of forfeiture entered against him [Doc.166] in Case No. 08-CR-0057-BJR by the district court on May 14, 2013.

**(C)  Related Cases.**

This case is related to Case No. 08-CR-0270-CKK, *USA v Omar Trevino Morales, et al.,* which was filed on September 2, 2008 and dismissed without prejudice on September 6, 2011.  Five of the six defendants in 08-CR-0270, including Cano-Flores, were added to the First Superseding Indictment in 08-CR-0057 on June 9, 2009.

# TABLE OF CONTENTS

Certificate As To Parties, Rulings, And Related Cases ..............................................i

Table of Contents.......... ..................................................................................... ii

Table of Cases and Other Authorities.............. ..... ..................................................vi

Statement of Jurisdiction................................................................................1

Statement of Issue Presented for Review.................................................................1

Statement of the Case.................................................................................3

Statement of Facts.................................................................................6

      A. The Government Witnesses ................................................................6

            1. Rejon-Aguilar................................................................6

            2. Hinojosa................................................................7

            3. Manolo................................................................8

      B. The Wiretap Evidence ................................................................9

Summary Of Argument................................................................10

Argument................................................................ ................................14

I. The Government Failed To Meet Its Burden To Prove
     That It Reasonably Minimized Non-Pertinent Calls..........................14

    A. Introduction ................................................................14

    B. Standard of Review  ................................................................14

    C. The Minimization Requirement Generally ....................................14

D. The Facts ........................................................................17

    1. The Defense Motion ................................................17

    2. The Government Response .....................................19

    3. The District Judge's Opinion ................................19

E. Assigning Burdens ..........................................................21

II. There Was No Basis to Find Jurisdiction to Intercept
Purely Foreign Calls ............................................................24

A. Introduction ...................................................................24

B. The Standard of Review ................................................25

C. Limitations of Title III ..................................................26

D. The "Listening Post" Exception ....................................26

E. Cell Tower Interceptions ...............................................28

III. It Was Error to Send Back the Transcript Binders
And Label Them "Evidence" ..............................................31

A. Introduction ...................................................................31

B. Standard of Review .......................................................32

C. The Facts .......................................................................32

D. Legal Analysis ..............................................................36

IV. Cano-Flores' Sentence Was Unreasonable ...............................40

A. Introduction ...................................................................40

B. Standard of Review .......................................................42

C. The Diminishing Importance of Acceptance of Responsibility .....42

D. The Scope of the Conspiracy...........................................................44

E. Cano-Flores' Role .........................................................................45

    1. Confusion as to Identity ...........................................................45

    2. Los Guerra.................................................................................46

    3. Participation in Drug Trafficking Generally.........................47

    4. Earlier Service as A Policeman ...............................................48

    5. No Violence................................................................................49

    6. No Wealth..................................................................................50

F. Sentences for Other Cartel Members .............................................50

    1. Osiel Cardenas-Guillen ...........................................................50

    2. Other Codefendants .................................................................52

    3. Individuals Referenced At Trial .............................................52

G. Conclusion.....................................................................................54

V. The Amount of the Forfeiture Was Excessive...........................56

A. Introduction ..................................................................................56

B. Standard of Review .......................................................................57

C. Calculating the Forfeiture.............................................................57

    1. Rejon-Aguilar's Basis of knowledge .....................................58

    2. Cano-Flores' Individual Role.................................................60

D. The Forfeiture Violated the Eighth Amendment ...........................61

Conclusion................... ...................................................................................63

Request for Oral Argument .......................................................................63

Certificate of Compliance ........................................................................63

Certificate of Service ...............................................................................63

Addendum Containing Pertinent Statues……......................................................65

Appendix ...................................................................................Separate Cover

Sealed Appendix   ............................................................. Filed Separately

# TABLE OF CASES AND OTHER AUTHORITIES

## I. CASES

*Alderman v. United States*, 394 U.S. 165 (1969) ..................................................15

*Scott v. United States,* 436 U.S. 128 (1978) ......................... 14, 16, 17, 20, 22, 23

*United States v. Ademaj*, 170 F.3d 58 (1ˢᵗ Cir. 1999) ...........................................37

*United States v. Anderson*, 39 F.3d 331 (D.C. Cir. 1994)
    *reversed on other grounds* 59 F.3d 1323 (D.C. Cir. 1995).................21

*United States v. Ali,* 619 F.3d 713 (7th Cir. 2010). ..............................................58

*United States v. Asibar*, 109 F.3dd 1023 (5th Cir. 1997) ....................................37

\* *United States v. Bajakajian,* 524 U.S. 321 (1998).........................................57, 61

*United States v. Barona,* 56 F.3d 1087 (9th Cir. 1995).......................................26

*United States v. Booker,* 543 U.S. 220 (2005).....................................................43

*United States v. Borroyo-Guiterrrez*, 119 F.Supp.2d 1168 (D.Colo. 2000) .......21

*United States v. Bras,* 483 F.3d 103 (D.C. Cir. 2007)..........................................55

*United States v. Capoccia,* 503 F.3d 103 (2nd Cir. 2007)...................................61

\* *United States v. Carter,* 449 F.3d 1287 (D.C. Cir. 2006)............16, 20 ,21, 22, 23

*United States v. Cotroni*, 527 F.2d 708 (2nd Cir. 1975) .....................................26

\* *United States v. Cruz*, 765 F.2d 1020 (11ᵗʰ Cir. 1985) .......................................39

*United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008);
    *cert. denied* ____ U.S. ___, 129 S.Ct. 295 (2008)................................42

*United States v. DeFries,* 909 F.Supp.13, 20 (D.D.C. 1995) .............................60

*United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996)............................27

\* *United States v. Eiland*, 398 F.Supp.2d 160 (D. D.C. 2005).............15, 21, 22, 25

*United States v.(Ernest) Glover*, 681 F.3d 411 (D.C. Cir 2012) .........................17

*United States v. (Lonnell) Glover*, 736 F.3d 509 (D.C. Cir. 2013) ....................27

*United States v. Goffer*, 756 F.Supp.2d 588 (S.D.N.Y. 201l) ............................21

*United States v. Holton,* 116 F. 3d 1536 (D.C.Cir. 1997) ...........31, 36, 37, 38, 39

*United States v. Hooks*, 551 F.3d 1205 (10th Cir. 2009).......................................37

*United States v. Hurley,* 63 F.3d 1 (1st Cir. 1995);
    *cert. denied* 517 U.S. 1105 (1996)  ....................................................60

\* *United States v. Law*, 528 F.3d 888 (D.C. Cir. 2008)............................................36

*United States v. Lizza Industries, Inc.,* 775 F.2d 492 (2nd Cir. 1985) ...............58

*United States v. Luong*, 471 F.3d 1107, 1110 (9th Cir. 2006) ...........................27

*United States v. McGaughy*, 485 F.3d 965 (7th Cir. 2007) .................................30

*United States v. Nunez*, 532 F.3d 645 (7 Cir, 2008) ...........................................37

*United States v. Onori*, 535 F.2d 938 (5th Cir. 1976) ..........................................37

*United States v. Orozco*, 630 F.Supp. 1418 (S.D. Cal. 1986) ............................21

*United States v. Peterson*, 812 F.2d 468 (9th Cir. 1987).....................................26

*United States v. Pierce*, 493 F.Supp.2d 611 (W.D.N.Y., 2006)........................21

*United States v. Pierre*, 484 F3d 75, 88 (1st Cir. 2007) ......................................57

*United States v. Pitt,* 193 F.3d 751 (3rd Cir. 1999)................................................60

*United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997) .....................................27

\* *United States v. Roberts,* 660 F.3d 149 (2nd Cir. 2011)......................................58

  *United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992) ........................27, 28

  *United States v. Simmons,* 154 F.3d 765 (8th Cir. 1998) ....................................60

  *United States v. Strothers*, 77 F.3d 1389 (D.C. Cir. 1996)..................................38

  *United States  v. Suggs*, 531 F.Supp.2d 13, 20 (D.D.C. 2008).....................16, 21

  *United States v. Treacy,* 639 F.3d 32, 48 (2nd Cir. 2011)...................................58

\* *United States v. Torres,* 908 F.2d 1417 (9th Cir. 1990) .........................14, 20, 21

\* *United States v. Varrone*, 554 F.3d 327 (2d Cir. 2009).......................................62

  *United States v. Whitmore*, 359 F.3d 609 (D.C. Cir. 2004)..................................31

  *United States v. Yarbrough*, 527 F.3d 1092 (10th Cir. 2008) ............................21

  *United States v Zambrana*, 841 F.2d 1320 (7th Cir. 1988) ..................................37

## II.  OTHER AUTHORITIES

\* Eighth Amendment , Excessive Fine Clause.....................................14, 15, 57, 61

  18 U.S.C. §2……....................................................................................3,4

  18 U.S.C. § 2510(4) ........................................................................................7

  18 U.S.C. § 2518(3) ......................................................................................26

  18 U.S.C. § 2518(5) ......................................................................................16

  18 U.S.C. §2518 (10)(a) ................................................................................15

  18 U.S.C. §3231.............................................................................................1

\* 18 U.S.C. §3553(a) ....................................................................44

18 U.S.C. §3553(e) ....................................................................41

18 U.S.C. § 3742(a) ...................................................................1

21 U.S.C. §841(b)(1)(A) ...........................................................62

21 U.S.C. §959…........................................................................3,4

21 U.S.C. §960…........................................................................3

21 U.S.C. §963…........................................................................3

28 U.S.C. §1291 .........................................................................1

U.S.S.G. §2D1.1(b)(1) ...............................................................43

U.S.S.G. §2D1.1(b)(2) ...............................................................43

U.S.S.G. §§2D1.1(b)(3) .............................................................43

U.S.S.G. §2D1.1(b)(12) .............................................................43

U.S.S.G. §§2D1.1(b)(13) ...........................................................43

U.S.S.G. §2D1.1(b)(14)(C) ........................................................43

U.S.S.G. § 2D1.1(c), Drug Quantity Table ................................42

U.S.S.G. §3B1.1(a) ....................................................................43

U.S.S.G. §3B1.3 .........................................................................43

U.S.S.G. §3E1.1…......................................................................41,42

U.S.S.G. Chapter 5, part A, Sentencing Table ...........................43

U.S.S.G. §5K1.1 .........................................................................41

* FBI Press Release, February 24, 2010, found at
  http://www.fbi.gov/houston/press-releases/2010/ho022410b.htm.   .50

*An Offer You Can't Reuse: How US Federal Prosecutors Force Drug
  Defendants To Plead Guilty,"* HUMAN RIGHTS WATCH,
  December 5, 2013, printed at http://www.hrw.org/print/
  Reports/2013/12/05/offer/-you-can-t-refuse ......................................40

* NEW YORK TIMES*, February 25, 2010 ................................................................50

* POPULAR SCIENCE, April 2014, *available at*
  http://www.popsci.com/article/technology/radio-tecnico-how-
  zetas-cartel-took-over-mexico-walkie-talkies ............................30, 53

  http://en.wikipedia.org/wiki/Nextel_Communications  ......................................30

* indicates authorities principally relied upon

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No.s 13-3051 and 13-3054

UNITED STATES OF AMERICA, Appellee

v.

AURELIO CANO-FLORES, Appellant

BRIEF FOR APPELLANT

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The appellant appeals from a final judgment of conviction entered against him on May 14, 2013 in the United States District Court for the District of Columbia. A timely notice of appeal was filed on May 20, 2013. An amended judgment was entered on May 20, 2013 and a second notice of appeal was filed June 3, 2013. The district court had jurisdiction pursuant to 18 U.S.C. §3231. This Court has jurisdiction pursuant to 28 U.S.C. §1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES PRESENTED

1.    When, if at all, in evaluating a claim that a wiretap was not reasonably minimized, and the defendant identifies a substantial number of calls of two minutes in length or more that the government agents did not find related to the

investigation in question, does the burden shifts to the government to explain failures to minimize which are based upon matters of content and context?

2.     Whether a district court may authorize the interception based solely upon the fact that the "listening post" is located within the court's jurisdiction?

3.     Whether a district court may base a finding that it has jurisdiction over the interception of mobile telephone calls between phones located entirely in Mexico because all interceptions occurred through cellphone towers in the United States, when there is no qualified evidence to that effect, only the unsupported, and questioned, assertion by an unqualified witness?

4.     Whether the trial court abused its discretion when it admitted disputed transcripts containing Spanish transcriptions and English translations of wiretap recordings into evidence and delivered, over defense objection individual copies of the transcripts to the jury at the beginning of deliberations?

5.     Whether it is "unreasonable" to sentence a defendant who is demonstrably and significantly less culpable than other defendants involved in the same international drug conspiracy to a "substantially more punitive" sentence simply because he elected to go to trial?

6.     Whether a forfeiture of $15,000,000,000, which allegedly constituted the entire gross receipts for an international drug cartel over a 10 year period, was correctly calculated (1) when based upon estimates by a cooperating witness who

lacked personal knowledge about significant amounts of the drugs and (2) when it was not limited to quantities of drugs that were foreseeable to the defendant during the period he was a member of the cartel?

7.      Whether a forfeiture of $15,000,000,000, which allegedly constituted the entire gross receipts for an international drug cartel over a 10 year period, violated the Excessive Fines Clause of the Eighth Amendment when applied to a defendant with a relatively limited role in a small geographic area over a portion of the time?

## STATUTES AND REGULATIONS

Pursuant to Fed.R.App.P. Rule 28(f) and D.C. Circuit Rule 28(a)(5), the pertinent statutes and rules are set forth in an Addendum to this brief.

## STATEMENT OF THE CASE

The government indicted 11 individuals on a drug conspiracy count (21 U.S.C. §§ 959, 960 and 963), and aiding and abetting (18 U.S.C. § 2) on March 13, 2008 for crimes alleged to have taken place in Mexico (08-CR-0157), *U.S. v. Antonio Ezequiel Cardenas-Guillen, et al.* App.97-101. In a separate indictment, on September 2, 2008, the government indicted six other individuals, including

Cano-Flores, on similar counts (08-CR-0270).[1]  App.531-533  On the same day, a warrant was issued for Cano-Flores' arrest in 08-CR-0270.  App.534-535.

Cano-Flores was detained in Mexico on June 9, 2009, App.597-598, App.610, pursuant to the U.S. charges.  App.599.  He was detained on the 08-CR-0270 warrant as a warrant for his arrest in 08-CR-0157 was not issued until August 12, 2009.  App.157-158.  He was extradited to the United States and was arraigned on the first superseding indictment on August 22, 2011.  He entered a plea of not guilty.  A second superseding indictment was filed on November 4, 2010.  App.129-156.  A third superseding indictment was filed on September 6, 2012.[2]  App.225-253.  He was arraigned on the third superseding indictment on September 7, 2012.  Again, he entered a plea of not guilty.

There was substantial litigation in the case.  For purposes of appeal, however, the key pleadings involve motions to suppress wiretaps, the use of transcripts/translations of selected wiretap recordings and sentencing issues.

Cano-Flores filed an initial motion to suppress the wiretaps, based on an alleged failure to reasonably minimize non-pertinent calls on August 31, 2012

---

[1]  Case No. 08-CR-0270-CKK, *USA v Omar Trevino Morales, et al.,* was dismissed without prejudice on September 6, 2011.

[2]  Defendants other than Cano-Flores, in various combinations, are charged with two additional counts of distribution of cocaine for importation to the United States for specific acts on October 5, 2007 and November 30, 2007, 21 U.S.C. § 959 and 18 U.S.C. § 2.

App.213-224; the government filed its opposition on September 10, 2012 App.254-265, and Cano-Flores filed his reply on September 17, 2012. App.266-285; App.311-317. The motion was denied on February 1, 2013. App.364-367.

A motion *in limine* which touched on the use of the transcripts of the wiretap recordings was filed by Cano-Flores on January 14, 2013 App.318-334, opposed by the government on January 22, 2013 App.335-352, with a reply by Cano-Flores on January 25, 2013. App.496-530. Cano-Flores also filed a supplemental memorandum concerning the issue on January 30, 2013. App.353-360.

After obtaining leave of court, Cano-Flores filed a supplemental motion to suppress the wiretaps on February 2, 2014. App.368-381. The government was permitted to postpone its opposition until trial was concluded and filed on May 6, 2013. App.445-459. Cano-Flores filed his reply on May 10, 2013. The motion was denied on May 24, 2013. App.491-494.

The jury selection commenced on February 13, 2013. The jury began deliberations on February 25, 2013 at 3:20 p.m. and returned a guilty verdict against Cano-Flores the next day. App.701; App.703-706. On May 13, 2013, Cano-Flores was sentenced to 35 years incarceration. App.481. The sentencing judge also imposed a forfeiture of $15,000,000,000. App.468-469. Cano-Flores timely filed a notice of appeal on May 20, 2013. App.481. The same day the

district judge filed an amended judgment App.482-490; Cano-Flores filed a second notice of appeal on June 3, 2013.  App.495.  Cano-Flores remains incarcerated.

## STATEMENT OF FACTS

The government's case at trial had two major components—the testimony of three cooperating witnesses and the recordings of forty-eight intercepted phone calls it played for the jury.[3]

### A.     The Government Witnesses

#### 1.     Rejon-Aguilar

Jesus Enrique Rejon-Aguilar[4] ("Rejon-Aguilar"), known as Mamito in Mexico where he admits he is hated and feared, is a self-confessed mass murderer and torturer.  App.639-644.  He is former member of the Special Forces, an elite force of the Mexican Army, App.764, who betrayed his country, App.766, in 1999 to become one of the original members of Los Zetas.  He initially served as a bodyguard to Osiel Cardenas-Guillen, the leader of the Gulf Cartel.[5]  App.603-607.  Rejon-Aguilar progressed through the organization, killing and torturing, and when he was arrested in 2011, he was the third most powerful Zeta in Mexico, outranked

---

[3]  The government also introduced evidence of a single seizure of marijuana which it sought to attribute to Cano-Flores and evidence of an inconclusive statement by Cano-Flores when he was interrogated while in Mexican custody.

[4]  Defendant 13 on the indictment.  App.130.

[5]  Cardenas-Guillen, currently serving a prison sentence in the United States, is the first named Defendant on the indictment.  App.129.

only by Heriberto Lazcano-Lazcano and Miguel Trevino-Morales.[6]  App.629-630.

Over the years, Rejon-Aguilar personally made over $50 million trafficking drugs

to the United States, and, at the time of his testimony, bragged it was still safely

stashed at his house in Mexico under the protection of the Zetas.   App.616;

App.643.

Rejon-Aguilar testified to the circumstances and contents of twenty of the

intercepted calls played at trial.  However, he participated in only four of them, all

with Samuel Flores-Borrego "Metro Tres."  Flores-Borrego was on thirteen of the

twenty calls about which Rejon-Aguilar testified, and is now deceased, thus

unavailable to corroborate anything Rejon-Aguilar said.

### 2.    Hinojosa

Jose Carlos Hinojosa ("Hinojosa"), known as Charly, is a former federal

prosecutor from Miguel Aleman, Tamaulipas, Mexico.  App.650.  He regularly

took bribes and collected fees from drug traffickers passing though the border area,

until the Gulf Cartel came to town in 2001, after which he switched employers.

19a10-12   He served the Gulf Cartel as a "plaza boss" for the city of Neuvo

Laredo.   Hinojosa was later running a major cross-border drug trafficking

organization of his own and moved tons of cocaine and marijuana into the United

---

[6]   Lazcano-Lazcano, now deceased, and Trevino-Morales, in custody, are
Defendants 3 and 4.  App.129.

7

States.   App.649.   Hinojosa was charged with drug conspiracy and money laundering in McAllen, Texas; he pled guilty to two of the counts and received a sentence of 24 years.  App.649-650.

While in jail, Hinojosa bribed guards, was caught with contraband cellphones, and tried to escape back to Mexico—he testified he paid one hundred thousand dollars to a friend of the warden for the failed attempt.  He admitted he made illegal payments to corrupt U.S. officials, including a Rio Grande sheriff and a federal customs officer.  App.651-652.  Hinojosa was unhappy with his sentence, and kept writing letters to the prosecutor, yet he never mentioned Cano-Flores. After seeing a news article about the cartel, he wrote again to say he wanted a benefit for the information he had, and wanted it in writing, yet he still did not reveal he "knew" Cano-Flores.   Instead, he gave up another cartel member. App.674-676.

Hinojosa testified to the circumstances and contents of eighteen of the intercepted calls played at trial, yet was not a participant on any of them.  App.653-656; App.659-667.

3.    "Manolo"

Manual Lopez Jaimes, who entered the United States as Victor Jaimes Bahena after a drug deal went bad in 2006 and he was forced to leave Mexico, App.679; App.686, is also known as Manolo.  ("Manolo")  In around 2003, he

8

knew Cano-Flores as police commander in Toluca, Mexico; there he asked Cano-Flores to assist him in removing an arrest warrant from his record for a murder he had committed in 1988.  App.687.  Manolo also served five years in Mexican jails for drug trafficking.  Manolo was arrested in the United States in 2007 and began cooperating with the government in 2008.  App.688.  He pled guilty to drug conspiracy and money laundering, App.678, he eventually received a 10 year sentence.  App.715.  Manolo said he knows Rejon-Aguilar, and knows he is a killer, but said all Zetas are the same.  App.688.

Manolo testified to the circumstances and contents of seven of the recorded calls.  He is on three of them with Cano-Flores and claimed that they concerned a shipment of marijuana.  App.687-690.

## B.    The Wiretap Evidence

The superseding indictments are based entirely upon evidence gleaned from a massive wiretap scheme administered in Houston, Texas, but directed primarily against Mexican nationals in the Mexican border area.  A staggering number of wire communication intercepts took place beginning in February 2006, involving more than fifty "target devices" and continuing at least until early 2008.  In Cano Flores' case alone, the government provided the defense with information from thirty-five different intercepted Nextel phone lines, resulting in more than 200,000 activations.  App.199-210.

9

Three of the wiretap authorizations sought by the government were for phones it claimed were used by Cano-Flores.  Initially, on March 8, 2007, the government applied for a wiretap on Target Device 21, Line 9101.[7]  On May 18, 2007, the government sought approval for wiretaps of two additional phones believed to be used by Cano-Flores, Target Device 28 (Line 6681) and Target Device 32, (Line 3243).  The authorization for the wiretap on Line 3243 was renewed on June 15 and July 13, 2007.  Despite this plethora of intercepts over a sustained period of time, the government was not able to produce any calls between Cano-Flores and two of the witnesses who testified against him.

Many of the calls are short, often ambiguous, if not innocuous, but for the interpretation given them by the "interpreting witnesses," who rarely participated in any of the calls and, on occasion, could even identify the speakers.

## SUMMARY OF THE ARGUMENT

### Wiretap Issues

Cano-Flores moved to suppress evidence arising from electronic surveillance conducted on twelve mobile telephones, asserting the government

---

[7]  The telephone numbers (when known) and ISMI numbers assigned to the intercepted phones are quite long and confusing.  For purposes of clarity in this brief, all devices will be referred to by the last four digits of the numbers used in their identification, regardless of the system used.  Complete identifying information about each of the lines examined is provided in the underlying pleadings.

agents did not reasonably comply with the minimization requirement.    He identified numerous "non-pertinent" calls each lasting two minutes or more, and contended that the burden of explaining, if possible, why such calls were not minimized shifted to the government.    The government and the district judge disagreed, concluding that Cano-Flores had the additional burden to examine the "content" and "context" of the calls and rule out any explanation based on those factors.    Cano-Flores contends this was error, that the government has the ultimate burden of showing reasonable compliance with the minimization requirement and that potential explanations which are within its special knowledge are more appropriately laid at its feet.

Shortly before trial, Cano-Flores moved to suppress, on jurisdictional grounds, evidence from wiretaps on six mobile telephones when all of the calls on those lines took place between persons in Mexico. Although the federal wiretap statute has no international application, the district judge concluded that the wiretaps, authorized by district judges in the Southern District of Texas, had been intercepted within that jurisdiction because the "listening post" was in Houston and, alternatively, that the calls had all been intercepted though cellphone towers in the United States.  Cano-Flores submits that first ground should be inapplicable for the interception of wireless telephone signals where there is no physical interception.  As for the second ground, he contends that the government presented

11

only the unsupported assertion by a witness who was unqualified to testify about the technical basis of the surveillance, and thus, failed to establish the requisite factual basis.

### Transcript Issues

The parties spent several months negotiating the accuracy of Spanish transcriptions and English translations of the relevant wiretap recordings. Stipulations were eventually reached premised on the understanding that the transcripts would ***not*** go back to the jury. During the trial, several government witnesses testified as to differences in the Spanish transcriptions, with resulting changes in the English meaning. Despite these changes, the district judge, over defense objection, decided to send individual copies of the transcript binders back to the jury during deliberations and further instructed the jury that they were ***evidence***. Cano-Flores submits that both the sending back of the transcripts as well as labeling them evidence were reversible error.

### Sentencing Issues

The government's evidence depicted Cano-Flores as a member of the Gulf Cartel for several years who occasionally assisted his superiors and the heads of associated drug trafficking organizations in different aspects of their drug trafficking. He also served as the "plaza boss" responsible for cartel drug trafficking in a border town of less than 5,000 people. The government also

12

introduced evidence that prior to becoming a member of the cartel, he assisted the cartel on a couple of occasions while a state policeman in central Mexico. He was *not* associated with any violence and did not receive significant profits, yet received a sentence of 35 years. When counsel argued that there were others involved with the cartel with much higher levels of responsibility who had received significantly more lenient sentences, the district judge explained that she was imposing a "substantially more punitive" sentence because Cano-Flores had gone to trial. While Cano-Flores agrees that acceptance of responsibility and cooperation with law enforcement will often merit a reduction in an otherwise appropriate sentence, he asserts that relative culpability must also be considered. To impose a substantially more punitive sentence on a demonstrably and significantly less culpable defendant simply because he chose to go to trial is "unreasonable," and this Court should vacate his sentence.

The district judge imposed a forfeiture of 15 *billion* dollars. The amount was intended to represent a "conservative" estimate of the gross receipts for the *entire* Gulf Cartel/Zetas organization from 2000 through 2010. The amount was the product of a post-trial interview with a government cooperating witness, who provided estimates for seven major "plazas" controlled by the cartel, despite never having any direct supervision over three of the largest plazas, nor there evidence he had ever seen the accounts concerning them. Cano-Flores objected to the inclusion

13

of the estimates from those plazas.  He also objected to consideration of receipts which were not reasonably foreseeable by him.  Finally, he objected to the size of the forfeiture on Eighth Amendment grounds.   All of these objections were overruled, but are renewed on appeal.

## ARGUMENT

## I.    THE GOVERNMENT FAILED TO MEET ITS BURDEN TO PROVE THAT IT REASONABLY MINIMIZED NON-PERTINENT CALLS

### A.    Introduction

The burden of proof can be critical when a challenge is made to compliance with the minimization requirement.  Courts hold that the government has the burden of showing proper minimization in conducting wiretaps, *see e.g. United States v. Torres,* 908 F.2d 1417, 1423 (9th Cir. 1990).  On the other hand, courts apparently place some burden on a defendant to identify calls which it claims demonstrate a failure to reasonably minimize.  *See, e.g. Scott v. United States,* 436 U.S. 128 (1978).  Cano-Flores suggests that a reconciliation of these approaches lies in the adoption of a shifting burden, first requiring a defendant to establish a *prima facie* case, based on objective criteria, such as the length of the calls and whether the government's own agents recognized any relevance to the calls, that suggests the government unreasonably failed to minimize more than isolated non-pertinent calls.  When defendant makes such a showing, however, the burden should shift to the government to provide permissible explanations for the failure

14

to minimize, especially explanations derived from the facts of its investigation. The government argued, and the district judge agreed, that Cano-Flores had the additional burden to eliminate any reason not to minimize the calls. This, Cano-Flores argues, was error, and his motion to suppress the affected wiretaps should have been granted.

### B.     Standard of Review

Review of a whether the government properly minimized calls not relevant to its investigation is *de novo, United States v. Torres, supra.*

### C.     The Minimization Requirement Generally

The Federal Wiretap Statute, at 18 U.S.C. §2518 (10)(a), authorizes "aggrieved persons" to move to suppress both the contents of the intercepted communications and the evidence derived from them on the grounds that:

(i)     the communication was unlawfully intercepted;

(ii)    the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii)   the interception was not made in conformity with the order of authorization or approval.

Cano-Flores' standing as an "aggrieved person" on the lines in question was not contested by the government. *See Alderman v. United States*, 394 U.S. 165, 174 (1969); *United States v. Eiland*, 398 F.Supp.2d 160 (D. D.C. 2005).

Section 2518(5) requires that when a wiretap order is secured, such order shall contain a provision that the authorization to intercept "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." The government's Applications for the wiretaps, the Affidavits in support, and the authorizing Orders all specifically addressed the minimization requirement.[8] The question, therefore, is whether the listening agents complied.

The test for whether the government agents conducted the wiretap in accordance with the minimization requirement is one of "reasonableness" and is judged on a case-by-case basis. *U.S. v. Suggs*, 531 F.Supp.2d 13, 20 (D.D.C. 2008), *citing Scott v. United States*, 936 U.S. 128, 139-140 (1978). Although not required to prevent the interception of each and every non-relevant conversation, the government must nevertheless "make reasonable efforts to 'minimize' the interception of such conversations." *United States v. Carter*, 449 F.3d 1287, 1295 (D.C. Cir. 2006) *citing Scott,* 936 U.S. at 139-40. This broad principle provides little specific guidance on resolving minimization issues in specific cases, since determining the reasonableness of minimization efforts is a fact-specific inquiry:

---

[8]   Copies of the documents are attached in Volume III of the Appendix, filed under seal.

"there can be no inflexible rule of law which will decide any case." *United States v.(Ernest) Glover*, 681 F.3d 411, 420-421 (D.C. Cir 2012) *citing Scott*, 436 U.S. at 139.

**D.    The Facts**

    1.    <u>The Defense Motion</u>

Using the relevant linesheets[9] for the wiretaps produced by the government, Cano-Flores performed a statistical analysis of the government's efforts to minimize "non-pertinent" conversations.[10]    Cano-Flores focused on two parameters.  One was the designation of a call as "non-pertinent," meaning the listening agent contemporaneously determined it was not criminal in nature or was otherwise unrelated to the offenses under investigation.  Cano-Flores accepted the contemporaneous designation of "pertinent" by the listening agent, as there would be no reason to minimize such a call even if it later appeared that the call was not relevant.  The other parameter was the commonly accepted threshold of two

---

[9] "Linesheets" is a term for files which list in sequence the data from each activation on a wiretap, as well as a contemporaneous synopsis of the intercepted conversation.  Each linesheet entry assigns a session number to the activation and then includes the following information: the date, time and duration of the call, whether the call was incoming or outgoing, the corresponding telephone number, the monitoring agent's determination if the call was deemed "pertinent" at the time, and whether or not the call was "minimized."

[10]  A detailed, step-by-step explanation of the analysis performed by Cano-Flores was provided in his motion to suppress.  App.213-220.

minutes as providing the monitoring agent with sufficient time to determine if a call is pertinent or not; this threshold also insured that the call consisted of an actual conversation.

Cano-Flores then identified the "non-pertinent" calls continuing for two minutes or longer that were not minimized by the listening agents. Cano-Flores provided tables to the government, and court, listing the activation number of each protected call that should have been minimized, but was not, listing the caller and callee on each call, the date of each call, and the duration of each call. App.721-756. In addition, he provided the government with the Target Device number and ISMI number for each challenged line, as well as the dates the interceptions were authorized and renewed. App.723-755.

On five of the challenged wiretap lines, the listening agents failed to minimize *100 percent* of the non- pertinent calls that were two minutes or longer, in some cases much longer.[11] On an additional seven of the challenged wiretap lines, the minimization of interceptions was deficient and insufficient.[12] Of the 1006 protected calls in this second category, the monitoring agents simply did not bother to minimize 862 of the calls. The government's aggregate failure rate across the lines was 85.7 percent. Cano-Flores moved to suppress the calls

---

[11] Lines 3243, 4353, 6670, 9095 and 6681.

[12] Lines 0748, 1649, 1657, 1745, 4953, 5347, and 6955.

from the affected wiretaps lines App.213-224, contending that consistent failure rates in the range of 85% to 100% were not signs of reasonable compliance, thus resulting in multiple violations of the very rights Title III was enacted to protect.

### 2.     The Government Response

The government's response, App.254-265, contended that Cano-Flores was required not only to identify the calls he asserted should have been minimized, but that he also had the burden to analyze the ***content*** of the calls to demonstrate that there was no permissible reason for the government's failure to minimize the calls. App.260.   The government referenced the factors discussed in *Scott*, discussed *infra*.[13]

### 3.     The District Judge's Opinion

The district judge found that Cano-Flores "failed to identify 'specific conversations' or 'a pattern of such conversations.'" App.366-367.  This is quite clearly incorrect.  Given the degree of specificity provided by Cano-Flores for the 925 challenged calls, the government could have absolutely no doubt as to their identity.

--------

[13]  The government also argued that even if there had been a minimization violation, suppression of the wiretap was not an appropriate sanction  App.263-264.  Although Cano-Flores replied to this argument in his reply App.266-285, the district judge expressly declined to reach the issue.  App.365.

The district judge also agreed with the government, however, that Cano-Flores had the obligation to not only identify calls which he asserted should have been minimized, but also to "take the necessary next step of providing the ***context*** of the conversations, context which presumably supported his argument that the government acted unreasonably in failing to minimize a given specific conversation." App.366. Given the information provided about each challenged call, including the date, time, duration, and parties to the call, the district judge's use of "context" apparently referred to the ***content*** of the calls in conjunction with the government's investigation. In finding Cano-Flores's efforts deficient, the district judge relied heavily on this Court's decision in *Carter,* which in turn relied on *Scott.*

The district judge also concluded that even if Cano-Flores had identified such conversations, it would "still find that the Government's efforts to minimize were reasonable under the totality of circumstances," App.367. Since the government actually never introduced any evidence as to ***how*** it had conducted the wiretaps,[14] this conclusion was based on the broad conclusion that the case was

---

[14] *Compare, United States v. Torres, supra* at 1423;

The DEA adopted reasonable procedure to assure compliance with the minimization requirements. Monitoring agents were instructed on the requirements and need for minimization. They were also required to read and sign a typed copy of minimization guidelines. Furthermore and DEA agent and an Assistant United States Attorney made

allegedly a "widespread conspiracy," and that the coconspirators communicated "in code."

### E.    Assigning Burdens

The burden of proving that the executing agents complied with the statutory minimization requirement falls upon the government.  *Torres*, 908 F.2d at 1423. *See also, United States v. Yarbrough*, 527 F.3d 1092 (10th Cir. 2008); *United States v. Goffer*, 756 F.Supp.2d 588 (S.D.N.Y. 201l); *United States v. Pierce*, 493 F.Supp.2d 611, 634 (W.D.N.Y., 2006); *United States v. Borroyo-Guiterrrez*, 119 F.Supp.2d 1168 (D.Colo. 2000); and *United States v. Orozco*, 630 F.Supp. 1418 (S.D. Cal. 1986).

At the same time, defendants bear a burden to "identify particular conversations so that the government can explain their non-minimization" *Suggs*, 531 F.Supp.2d at 20 n.3 *citing Carter*, 449 F.3d at 1295.  Defendants cannot meet such a burden simply by citing to a percentage of calls which were not related to the subject of the investigation, *Scott* (only 40% of calls related to narcotics), the percentage of calls minimized, *United States v. Anderson*, 39 F.3d 331, 342 (D.C.

---

themselves available on a twenty-four hour basis for consultation. Testimony at the suppression hearing reveals that monitoring agent frequently questioned the on-duty DEA agent on proper minimizations procedures.

*Accord, United States v. Eiland, supra* at 175 ("the government provided a description of the minimization process, including a description of how each agent involved in the monitoring was trained to minimize.")

Cir. 1994) *reversed on other grounds* 59 F.3d 1323 (D.C. Cir. 1995) (only 10% of calls minimized), or even the percentage of "non-pertinent" calls not minimized, *Carter,* (only 27% of non-pertinent calls minimized).

The Supreme Court in *Scott* recognized that there could be many legitimate reasons why it would be reasonable to listen completely to a call which is deemed non-pertinent or unrelated to the subject of the investigation.   Consequently, arguments couched in such broad terms, proffering no "information as to the number, timing, frequency, or subject matter" of conversations alleged to have been inadequately minimized, have been rejected.  *Carter,* 449 F.3d at 1295.*See also, Eiland,* 39 F.Supp.2d at 175 (Eiland cannot demonstrate failure to minimize with "isolated incidents of irrelevant interceptions").

The question then becomes if the government has the ultimate burden of proving compliance, and the purpose of requiring the defendant to identify conversations is so that the government can "explain" the failure to minimize, at what point does the burden shift from the defendant to the government?"  Cano-Flores suggests that the answer lies in a closer look at *Scott.*

The Supreme Court in *Scott, supra* at 140-142, rejected a simplistic focus on the number of calls which were not about narcotics, and identified a number of potential reasons why a call not obviously about drugs might be listened to in its entirety.  Some may be described as plainly objective in nature—such as short

22

calls, wrong numbers, calls where the person called was not available, even calls to weather information.  A defendant challenging a wiretap may should eliminate such calls from a minimization analysis.  Cano-Flores did so by establishing a two minute threshold before identifying a call as one that should have been minimized.

Other potential reasons, however, derive from the content and context of the calls.  Both the government and the district judge would place on a defendant the burden on disproving these possible reasons, when it is precisely the government which is in the best position to know whether or not they apply.  Although the conspiracy is described as "widespread," the government had previously conducted numerous wiretaps before the one in question.  If a call is "ambiguous in nature or apparently involv[ing] ... guarded or coded language,'' *Carter,* 449 F.3d at 1295, citing *Scott,* 436 U.S. at 140, it is the government who is in the best position to explain that.  Likewise, if an ***unidentified*** caller is suspected of being a member of the conspiracy, presumably the government through its extensive investigation could identify the other number as suspicious, whereas the defendant could not.

The United States expressly refused the burden of demonstrating that it reasonably minimized the non-pertinent calls lasting over two minutes, and the district judge let them do it.  Both were wrong.  Since the government failed to meet its burden the wiretaps should have been suppressed.

## II.    THERE WAS NO BASIS TO FIND JURISDICTION TO INTERCEPT PURELY FOREIGN CALLS

### A.    Introduction

Shortly before trial, Cano-Flores moved to suppress, on jurisdictional grounds, evidence from wiretaps, authorized by district judges in the Southern District of Texas, on six telephone lines when all of the calls took place between persons in Mexico.  App.368-381.  The motion was based on a motion filed in a related case in the courthouse, *United States v. Lerma-Plata*.  App.536-549.  When the judge in that case denied that motion without a hearing, but on stipulated facts, Appp.571-593, the district judge informed the government that it would permit them to answer the motion after the trial.  The government did so, App.445-459, and Cano-Flores responded.  App.460-463.  Accepting that all the target devices were located in Mexico and that the federal wiretap statute has no international application, the district judge ruled "[a]s in *United States v. Lerma-Plata,* the interceptions in this case took place in the DEA wire room located in Houston, Texas after they had been accessed by cellular towers located in the United States" and that consequently "all communications were intercepted lawfully under Title III and the wiretap orders."  App.493.  This ruling has two arguably independent bases: 1) the "listening post" was in Houston and, 2) the calls had all been intercepted through cellphone towers in the United States.

Cano-Flores submits that first ground, the site of the listening post, should be inapplicable for the interception of wireless telephone signals because there is no physical interception as is the case with a traditional telephone connected through telephone wires.  Given the ability to transfer wireless signals anywhere in the world, allowing the government to handpick where it wanted to receive the signals would make any jurisdictional limitation illusory.

As for the second ground, Cano-Flores contended the government needed to present evidence from a qualified witness about where and how wireless signals were acquired.   While apparently understood at the start of the trial, the government's opposition  presented only the unsupported assertion by a case agent who was unqualified to testify about those issues.  Thus, Cano-Flores contends that the proper jurisdictional basis has not been shown and the products of those wiretaps should be suppressed.

### B.    Standard of Review

A denial of a motion to suppress is reviewed *de novo* for the district court's legal conclusions and for clear error on the factual findings.  In wiretap cases, "[w]e 'do[ ] not typically give a second layer of deference to a district court's assessment' of the authorizing court's determinations" *United States v. Eiland*, 738 F.3d 338, 347 (D.C. Cir. 2013) (citations omitted).

25

## C.    Limitations of Title III

Title III sets forth the jurisdictional limits of an order to intercept communications, provides the scope of the communications that can be lawfully intercepted with a wiretap and delineates the procedure for obtaining such a wiretap:

> Upon application [a] judge may enter an ex parte order … authorizing or approving interception of wire, oral, or electronic communications **within the territorial jurisdiction of the court** in which the judge is sitting (and **outside that jurisdiction but within the United States** in the case of a mobile interception device authorized by a Federal court within such jurisdiction), if the judge determines on the basis of the facts submitted by the applicant that …

18 U.S.C. § 2518(3) (emphasis added).  It is a generally accepted proposition that "Title III [ ] has no extraterritorial force."  *United States v. Barona,* 56 F.3d 1087, 1090 (9th Cir. 1995) (quoting *United States v. Peterson*, 812 F.2d 468, 490 (9th Cir. 1987)); *United States v. Cotroni*, 527 F.2d 708, 711 (2nd Cir. 1975) (refusing to apply Title III to a foreign wiretap).

## D.    The "Listening Post" Exception

The principle issue for the district judge was the definition of "interception" and its application across international borders.[15]    The statute defines "interception" as "aural or other acquisition of the contents of any wire, electronic

---

[15]    The government conceded Cano-Flores had standing to bring the motion and that all the intercepted phones were "physically located in Mexico."  App.448.

or oral communication through the use of any electronic, mechanical or other device."  18 U.S.C. § 2510(4).  A line of circuit court cases has interpreted this language to mean interception occurs both where the communication is captured or redirected originally, as well as "the place where the redirected contents are first heard."  *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992).  *See also United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996); *United States v. Ramirez*, 112 F.3d 849, 851-53 (7th Cir. 1997); and *United States v. Luong*, 471 F.3d 1107, 1110 (9th Cir. 2006).  None of these cases concern wiretaps where the intercepted communications occurred entirely between devices located in another country.

Cano-Flores submits the presumptive bases that underpin this entire line of federal cases are inapplicable to wireless communications.  As this Court has astutely noted, the phrase "listening post" does not appear anywhere in the Act.  *U.S. v. Glover*, 736 F.3d 509, 514 (D.C. Cir. 2013), and there is no "listening post" exception to the protections supposedly afforded by the Act.  Taken to its logical conclusion, adoption of the "location of interception" rule would permit United States law enforcement agents to define an intercept by deciding where *they* would like to receive the wireless communications, and confer jurisdiction to issue orders intercepting communications anywhere in the world.  Cano-Flores agrees with the serious concerns expressed by Judge Meskill in his concurrence in *Rodriguez*: "I

27

cannot join the majority in holding that the unilateral decision of law enforcement agents as to where to set up their listening post can grant authority to a judge in any jurisdiction to authorize a phone tap in any other jurisdiction." *Rodriguez*, 968 F.2d at 144. Under this view, a court's jurisdiction to issue a wiretap order on a wireless device is potentially boundless, and Cano-Flores suggests the "listening post" exception is undeniably outdated.

### E.    Cell Tower Interceptions

Despite the findings of the district judge, the record is bereft of any actual evidence that the intercepted calls were accessed by cellular towers located in the United States. Having read the decision in *Lerma Plata,* she assured the government she was probably "pretty much going to follow Kollar-Kotelly's ruling." App.601. Responding to defense counsel's observation: "that there are some facts that have not been established in this case," she advised the government: "you're going to need an affidavit … establishing where those interceptions took place." App.760-761. Leave to file was granted, but the government was permitted to postpone its response until trial was concluded. The judge left the nature of the response to the government: "whether you want to answer, you want to adopt the [*Lerma-Plata*] brief, maybe just supplement it with an affidavit." 2-01p.66 Cano-Flores could reasonably expect that a qualified

28

affidavit, or testimonial evidence, would be forthcoming **with** the government's response.

Instead, the government merely cited to conclusory trial testimony by Agent Lewis that calls made on Mexican cellular phones could only be intercepted if they were picked up by United States cell towers.  App.447-448.  Lewis' testimony at trial was not based on personal knowledge and his opinions and unsupported conclusions were not evidence.  Lewis certainly demonstrated he was no expert on telecommunications technology—having testified calls could only be picked up within a certain distance from a cell tower, he said had no idea what that distance actually was.  He admitted he did not "know the number or the location of the Nextel towers along the border," and was "not sure about the Nextel capabilities in Mexico," but believed there were also Nextel International towers in Mexico. App.612-614.  Tellingly, when asked to explain part of the wiretap interception process to the jury, Lewis replied   "(o)nce she contacts the service provider **they flip some switches and plug in some wires** and then we're able to intercept those calls in our wire room in Houston, Texas."  App.609. (emphasis added).

The affidavits in support of the applications for wiretap orders indicate most of the phones targeted are push-to-talk phones, at the time a niche-market phone offered by NexTel, and no longer available.  It is not readily apparent that NexTel signals were broadcast over the same towers as conventional cellphones,

29

potentially contradicting the government's assumptions about relationship between "American cell towers" and the intercepted calls.[16]  Without more information, the government, indeed any layperson, cannot establish that calls placed with these phones were first captured, or heard, in the United States.

Also, it is well known the Zetas have a sophisticated and elaborate, albeit covert, communications network that covers much of Mexico, including their own tower system (popularized in the press as "Narco-Towers).  A recent article in POPULAR SCIENCE, April 2014, describes the system and is titled "Radio Tecnico" in homage to Jose Luis del Tora Estrada, an individual referenced at trial.  The nature of the interplay, if any, between the Zeta tower system and the United States cell towers raises issues that must be addressed.

The fact remains that the requisite facts have not been established in Cano-Flores' case.  Accordingly, he was entitled to an evidentiary hearing on his motion to suppress.  *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007).

---

[16] A quick internet search yields this description of the technology: "Nextel's [push-to-talk] network operated in the 800 MHz Specialized Mobile Radio band and used iDEN technology developed by Motorola." (http://en.wikipedia.org/wiki/Nextel_Communications)

### III.   IT WAS ERROR TO SEND BACK THE TRANSCRIPT BINDERS AND LABEL THEM "EVIDENCE"

#### A.     Introduction

The recordings of the intercepted calls were a major component of the government's case.  With few exceptions, the government played the recordings through the testimony of witnesses who were ***not*** parties to the calls.  Consistent with this Court's recommendations in *United States v. Holton,* 116 F. 3d 1536 (D.C.Cir. 1997), the parties spent several months negotiating the accuracy of Spanish transcriptions of the relevant recordings as well as the English translations. The recordings were often hard to hear and many portions were inevitably unintelligible to both parties' translators.   There were numerous disputes over subtle differences; nonetheless, stipulations were reached as to both the Spanish transcriptions as far as they could be understood and the resulting English translations.   From Cano-Flores' perspective, the stipulations were expressly premised on the understanding that the transcripts would ***not*** go back to the jury, but would only be used as aids in the courtroom.  Pursuant to those stipulations, binders containing a Spanish transcription of each call to be played at trial, alongside an English translation, was prepared for each juror (the "Transcripts").

During the trial, several government witnesses testified as to differences in the Spanish transcriptions, with resulting changes in the English meaning.  Given

31

these changes, Cano-Flores became more insistent that the Transcripts not go back to the jury, as the parties were no longer in agreement as to their correctness. Despite these changes, at the end of the trial, the district judge, over defense objection, decided to send individual copies of the transcript binders back to the jury during deliberations and further instructed the jury that they were ***evidence***. Cano-Flores submits that both the sending back of the Transcripts as well as labeling them evidence were reversible error.

### B.    Standard of Review

A district court's evidentiary rulings are reviewed for abuse of discretion." *U.S. v. Whitmore*, 359 F.3d 609, 616 (D.C. Cir. 2004).

### C.    The Facts

Before the government played the first recording of a wiretapped call for the jury, it moved into evidence the Spanish transcription and English translation from the binder.  Defense counsel objected, advising the district judge that the several-month-long negotiations involving the transcriptions and transcripts had ultimately resulted in stipulations solely "because the transcript was only going to be a guide for the jury and would not go back in the room with them as evidence."  App.618-619.  The district judge then told the parties "we'll figure out another way of making them part of the record, having the jury look at them, not send them to the jury room."  The parties and the district judge agreed to call the Transcripts

32

"demonstrative exhibits," and the district judge promised "they will not go back into the jury room."     App.619-620.     Relying upon the district judge's representation, and given the prior agreement between the parties, defense counsel believed there was no need or reason to prepare an alternative Transcripts binder.

The government asked its witness, Rejon-Aguilar, if he had reviewed the Spanish transcriptions and if they were accurate compared to the audio recordings. Rejon-Aguilar responded variably, yes, and almost accurate,  App.621-623, but then disputed the accuracy of a transcription after a call was played:  "on the transcription here, they put, 'take it to me,' but it's not 'take it to me.'  It's he owes me."  App.622.  Later, following confusion over a question related to a statement in the Transcript which had been misattributed, Rejon-Aguilar volunteered:  "I want to explain something.  In the transcriptions.  Spanish is very complicated, and there are words when, in fact, what they are discussing is something different." App.623.  Revisiting the issue at the next break, the district judge observed: "I'm not sure how far your stipulations took you in terms of accuracy and all on these." App.625.  Considering how to proceed going forward, defense counsel cautioned: "[the] problem is [the] witness just changed one of the transcripts we all thought we had agreed on.  And he's the one saying it's very complicated, it means something different than I thought we meant.  …  we thought we had an agreement, but he's telling us that the Spanish—essentially , that the Spanish is

33

wrong."  App.625.   On cross examination, Rejon-Aguilar testified to another inaccuracy and agreed the Transcript was wrong yet again.  App.646-647.

A second witness, Hinojosa, initially testified he had reviewed the Spanish transcriptions of the calls to be played, and they were accurate, and that he would have informed the government if any of them were not correct.  App.653-654. Nonetheless,   Hinojosa then testified the transcriptions were wrong.  Reviewing one call, he asserted:  "The thing is they didn't put "Dobles" there, and that's Costilla…" [ ] "he was the cartel's leader."  App.653654n657.  As Hinojosa had already identified Cano-Flores as one of the speakers on the call, the implied association with Jorge Eduardo Costilla-Sanchez, a primary figure in the cartel's organization was harmful to Cano-Flores' case as well as completely unexpected. At the close of the day, the district judge raised the issue of the Transcripts in light of the government's requested jury instructions which sought to treat the Transcripts as substantive evidence and asked the parties to research the matter. App.668.

The district judge solicited the parties' positions on the question of whether the Transcripts should be sent back to the jury during a bench conference the next day.  Cano-Flores argued cases permitting transcripts of recordings to go to the jury were predicated on the transcripts' accuracy.  He reminded the district judge that the situation had changed dramatically since the parties had first submitted

proposed jury instructions.  "Two government witnesses, under oath, have testified that the transcripts are not accurate."  Cano-Flores maintained his position that the Transcripts should not go back to the jury room, but rather, they should be made available to the jurors, if the jurors requested to listen to any of the recorded calls again, along with the actual playing of the appropriate tapes.  App.670.  The government  claimed the Transcripts were overwhelmingly accurate and argued "it appears there's authority from virtually every circuit standing for [the] proposition" that the Transcripts can be admitted into evidence.  App.670.  The district judge found that the "corrections, disagreements are minimal and trivial" disregarding Cano-Flores' assertion that the insertion of one of the most important leaders of the Gulf Cartel into a conversation was a "whopper" and material.  Over defense objections, the district judge ruled the Transcripts would go back to the jury and would be considered evidence.   App.670-671.

Cano-Flores' final argument was equally unavailing, but preserved for the record:

> the transcripts by themselves do not convey what the jury heard. We have had some portions on the transcript that are very emotional — people crying, people angry.  By simply looking at the written word, they're not going to get that.  And with forty-eight having been played, they're not going to remember which one is which.  And I would say that that's going to give a biased impression to the jury.  It's absolutely critical, especially when it's in another language, that the jury

> be able to hear the modulation of the voice, the emotions of
> the people speaking, whether or not someone is making a joke.
> These assessments cannot be made by looking at a page with
> typed words on them.

App.670-671.   The district judge responded that the emotional content of the

recordings made no sense "without understanding the language" and added: "***The***

***jury is <u>relying</u> on the transcripts***.  They've read the transcripts.  To make them

come back in here and hear the tape again in order to read the transcript makes no

sense and, quite frankly, I don't think the law requires it."  App.671.

### D.    Legal Analysis

This Court has recognized the inherent dangers posed by the improper use of

written transcripts of spoken words at trial and, accordingly, has recommended

sound precautionary procedures for limiting those dangers.  "***The principal risk of***

***indiscriminately permitting the use of transcripts by jurors is that ... the jurors***

***may ... transform the transcript into independent evidence of the recorded***

***statements***."   *U.S. v. Law*, 528 F.3d 888, 901 (D.C. Cir. 2008) (emphasis in

original) quoting *United States v. Holton,* 116 F. 3d 1536, 1540 (D.C.Cir. 1997).

Cano-Flores submits this is exactly what happened in his case when the trial court

failed to follow the procedures set out in *Holton*.

The key factor in determining the propriety of using written transcripts of

recordings, be it for use in trial or in deliberations, is the necessity to give a

suitable limiting instruction to the jury.  *Holton* at 1543.  This principle has been

recognized by other circuits.  "As with other forms of potentially prejudicial evidence, the key to protecting a defendant's rights in this situation lies in seeking limiting instructions."  *U.S. v. Onori*, 535 F.2d 938, 949 (5th Cir. 1976); *see also U.S. v. Hooks*, 551 F.3d 1205 (10th Cir. 2009); *U.S. v. Nunez*, 532 F.3d 645 (7 Cir, 2008); *U.S. v. Ademaj*, 170 F.3d 58 (1st Cir. 1999) (repeated instruction transcripts not evidence); *U.S. v. Asibar*, 109 F.3dd 1023 (5th Cir. 1997) (transcripts not allowed in deliberations); and *U.S. v Zambrana*, 841 F.2d 1320 (7th Cir. 1988) (transcripts not allowed in deliberations).

The limiting jury instruction given by the district judge at Cano-Flores' trial, at first blush, appears to comport with *Holton* requisites:

> During this trial you have been given transcripts of translations from Spanish into English of the conversations that could be heard on the wiretap recordings received in evidence.  I have admitted the transcripts for the purpose of aiding you and following the content of the conversations as you listen to the wiretaps which were spoken in Spanish and also to aid you in identifying the speakers.  The transcripts are evidence just like any other evidence in this case.  However, the wiretap recordings are the actual evidence of what was said and should you find it necessary during your deliberations I can arrange to have them played back to you while you follow along with the transcripts.  The parties have stipulated that the transcripts accurately translate the conversation between the speakers in all material respects.

App.699-700.

However, on closer look, it was undercut by the addition of one sentence stating that the Transcripts "are evidence just like any other evidence in this case,"

37

an instruction given over defense objections.  App.697.  The Transcripts ***were not*** like any other evidence in the case, and were not to be given the same weight. Offering to play Spanish recordings for the jury, if requested, when they already had English translations easily at hand was a hollow offer, one not accepted.

While acknowledging "a transcript can be helpful when the jury listens to replays of tape recordings during deliberations," this Court has warned the same circumstances "may prejudice the defendant if it is presented without proper safeguards."  *Holton*, 116 F.3d at 1540-41.  One of the safeguards endorsed by *Holton* is "the court must ensure that the transcript is used only in conjunction with the tape recording."  *Id*. at 1543.  Thus, this Court "found error when government-prepared transcripts were admitted into evidence and could be read by the jurors without listening to the tapes…"  *Id*. at 1541, *citing to U.S. v. Strothers*, 77 F.3d 1389 (D.C. Cir. 1996).  The district judge in Cano-Flores committed the same error, and then compounded it by sending, not one, ***but twelve copies*** of the Transcripts to the jury, clearly singling out the Transcripts for special consideration.  No other exhibit received the same treatment.  It implied  "This 'evidence' is so important, I want to make sure you each have your own copy."

Very few cases deal with the circumstances presented by Cano-Flores, wherein the transcripts involve translations from another language.  However, the use of English transcripts of Spanish recordings was upheld where the district

38

judge made every effort "to ensure that the jury relied upon the tape recording rather than upon the transcript" by having an interpreter signal to the jury when to turn the pages of the transcript, thereby enabling "the jury to detect changes in voice modulation and note any hesitancies or other characteristics which might give meaning to the tape recording." *U.S. v. Cruz*, 765 F.2d 1020, 1024 (11th Cir. 1985). Cano-Flores urges this Court to adopt the view of the Eleventh Circuit, that even when witnesses at trial do not speak English, voice modulation and other aural characteristics still play a role in the jury's evaluation of spoken testimony and evidence. Cano-Flores submits this protects a defendant from unfair prejudice. The *Cruz* court, in addition, declared it "would not routinely submit either the tape recording or the transcript to the jury for consideration during its deliberations, but would provide them for the jury only upon the jury's request." *Id*.

The district judge abused its discretion by admitting evidence known to be unreliable and by not implementing any safeguards for the review of the unreliable evidence.[17] There can be no doubt the multiple, personal copies of the Transcripts both signaled and highlighted their importance to the jury and increased the emphasis the jurors would give to the Transcripts version of the phone calls.

---

[17] The district judge also abused her discretion by reversing her position on the admissibility of the Transcripts so late in the trial that counsel was unable to pursue alternatives that would have been available to Cano-Flores earlier. *See, Holton*, 116 F.3d at 1543.

Whereas it is assumed jurors normally consider the same evidence at the same time, mostly because there is only one copy or one exhibit, here the jurors were free to devote as much time as they wanted to the Transcripts in lieu of examining other evidence and regardless of what the other jurors were considering.

The error by the district judge was not harmless. The government had already stated the phone calls represented "90 percent of our evidence." App.595. *Holton* has remarked the prejudice to a defendant of the "double exposure to transcripts of crucial evidence." *Holton*, 116 F.3d at 1542 (citations omitted). Here the exposure was constant and the rate was incalculable.

## IV.   CANO-FLORES' SENTENCE WAS UNREASONABLE

### A.    Introduction

Cano-Flores' case presents a paradigmatic example of what has come to be known as the "trial penalty;" *see "An Offer You Can't Reuse: How US Federal Prosecutors Force Drug Defendants To Plead Guilty,"* HUMAN RIGHTS WATCH, December 5, 2013, available at http://www.hrw.org/print/reports/2013/12/05/offer-you-can-t-refuse-0. Although demonstrably less culpable than higher ranking members of the conspiracy or leaders of cooperating drug trafficking organizations, Cano-Flores received a significantly harsher sentence simply because he went to trial. The district judge frankly acknowledged this in

responding to counsel's "plea about the fact that there are others who have been equally as culpable, if not more so, (and) have received lesser sentences:"

> And that the real distinction is that you have chosen, for whatever reasons you've chosen, not to cooperate. The Court has to consider **how much of a disparity that warrants**. Because one of the considerations I must consider is there not be unwarranted sentencing disparities between you and defendants found guilty of similar crimes.
>
> So putting all of that together, I do not find that a life sentence is warranted in this case. I do find that a sentence **substantially more punitive** than those imposed on people who cooperated and assisted the Government and did not put them through a trial is warranted. And I am going to impose a period of 35 years' incarceration.

Tr.5/13/13: 77-78)(emphasis added)

A key sentencing principle is that similarly situated individuals should receive similar sentences. 18 U.S.C. §3553(a)(6). Conversely, between two otherwise similarly situated defendants, one who pleads guilty and cooperates with the government should normally receive a lesser sentence. *See,* 18 U.S.C. § 3553(e); U.S.S.G. §§3E1.1, 5K1.1. The question presented by Cano-Flores' case is what degree of disparity is warranted when the defendants who cooperate are significantly more culpable than a defendant who goes to trial.

Cano-Flores will first discuss why sentencing guideline calculations in the case of an international drug cartel are unaffected by guilty pleas. Cano-Flores then discusses the scope of the cartel's activity, his alleged role and, finally, direct comparisons to others involved in the same cartel or doing business with it.

41

**B.    Standard of Review**

This Court in *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008);

*cert. denied* ___ U.S. ___, 129 S.Ct. 295 (2008) reiterated the standard of review

for sentencing issues:

> Our review of the District Court's sentencing decisions is
> guided by a three-part test.   Purely legal questions are
> reviewed *de novo*; factual findings are to be affirmed unless
> clearly erroneous; and we are to give due deference to the
> district court's application of the guidelines to facts.
> (quotations omitted.)[18]

**C.    The Diminishing Importance of Acceptance of Responsibility**

In explaining the her "substantially more punitive" sentence, the trial judge

placed the greatest emphasis on cooperation with the government, but obviously

the mere fact of entering a guilty plea could also result in a lesser sentence.   The

Sentencing Guidelines specifically permit a two level reduction in the offense level

for acceptance of responsibility, and a third level reduction is available upon

government motion after an early plea, U.S.S.G. §3E1.1.   Yet, in cases of leaders

of, and even managers within, international drug cartels, acceptance of

responsibility has very little formal impact.   In such cases, the offense level based

upon the quantity of the drugs will inevitably start at 38, U.S.S.G. 2D1.1(c), Drug

---

[18]    Although Cano-Flores raised numerous objections to the sentencing
guideline calculations, given this deferential standard he does not pursue them as
legal objections on appeal.

Quantity Table. For a leader, there will be a four level increase, U.S.S.G. §3B1.1(a), which in turn will trigger an additional two level increase for importation, U.S.S.G. §2D1.1(b)(14)(C), which means an offense level of 44. Given the ubiquitous presence of weapons in the cartel and the men employed to use them, additional two level increases for possession of a dangerous weapon and using or threatening violence would easily apply, U.S.S.G. §2D1.1(b)(1)&(2). At the resulting level offense of 48, even a three level reduction for acceptance of responsibility would not go below the resulting maximum offense level of 43, which carries a presumptive sentence of life. *See,* U.S.S.G. Sentencing Table at Chapter 5, part A.

Even a low level manager or supervisor without responsibility for violence, such as Cano-Flores was alleged to be, will have a level of 45, with a similar result. Moreover, these calculations do not take into account potential increases for abuse of a position of trust, U.S.S.G. §3B1.3, paying a bribe to a law enforcement officer, maintaining a premise for distributing drugs, or using an airplane during an unscheduled flight, U.S.S.G. §§2D1.1(b)(3)(A),(11)&(12), all of which are common instances of relevant conduct in cross-border drug trafficking.

Cano-Flores agrees that in a post-*Booker* (*United States v. Booker,* 543 U.S. 220 (2005)) world, a judge may ignore the Sentencing Guidelines and impose a below life sentence on one who pleads guilty, but the application of the acceptance

43

of responsibility guideline itself has no legal effect. Consequently, this places greater importance on the other factors enumerated in 18 U.S.C. § 3553(a), including (6), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

### D.    The Scope of the Conspiracy

All parties agree the Gulf Cartel, including the Zetas organization, was a massive drug conspiracy responsible for sending tons of cocaine and marijuana into the United States from Mexico.  While there were other major Mexican cartels, government witness Rejon-Aguilar testified that the Gulf Cartel/Los Zetas organization was ultimately comprised of approximately 25,000 members, and, at its height, controlled the Mexican states of Campeche, Coahuila, San Luis Potosi, Tamaulipas, Veracruz, and Zacatecas; three-fourths of the state of Chiapas; and shared control of the states of Durango, Nuevo Leon, and Oaxaca.  App.630-634. Thus, the scope of the cartel extended over 277,192 square miles, nearly 40% of Mexico's land area, with a population of more than 28 million (28,266,878).  Indeed, even though the two organizations subsequently became bitter rivals, a map recently published by the WASHINGTON POST purporting to show the areas of influence of the cartels in 2012 showed that, between them, the two organizations continue to control much of the drug trafficking in those areas.  App.418.

44

Both organizations employed violence against rival organizations and Mexican authorities, as well as against those members who violated the organizations' polices.  Sometimes this would involve armed conflict, but also involved kidnapping, torture, executions and assassinations of otherwise helpless victims.  Moreover the Zetas, to a much larger degree than the Gulf Cartel, also engaged in other criminal activities such as extortion, kidnappings for ransom and human trafficking.  Rejon-Aguilar himself admitted killing, and sometimes torturing, 30 individuals.  App.637-643.

    **E.**    **Cano-Flores' Role**

        1.    <u>Confusion as to Identity</u>

As set forth in his sentencing memorandum, App.423-424, the government expressed confusion about Cano-Flores' actual identity.  He was variously identified as responsible for the cartel's activities in Camargo or Reynosa, Mexico, but no evidence at trial connected him to either place.  Nor was there evidence introduced that he was, as previously alleged, a "high-ranking" leader of the Gulf Cartel, a "commandante" controlling a highly trained guard unit, or someone with the same status as Metro Tres, one of the "plaza bosses" for the city of Miguel Aleman.  Instead his role was much more prosaic.

2.    <u>Los Guerra</u>

Although there was no mention of it in any of the recorded telephone calls introduced by the government, all three of the government's cooperating witnesses testified that Cano-Flores was the "plaza boss" for Los Guerra, a village of less than 5000 people, half of them children, occupying the bank of the Rio Grande River across from Texas.[19]  According to Rejon-Aguilar, this also included four other little villages, El Nogalito, Los Aldamas, Estacion Aldamas and Arcabuz, App.627; these villages had a combined population of less than 2,000.  This is arguably confirmed by the excerpt of the captured spreadsheet introduced by the defense at sentencing which showed one "Yanke" as head of Aldama  App.467; (there is no mention at all of Los Guerra.)

Although the presentence report refers to the responsibilities of a "plaza boss" as including "accounts, security, and bribes to corrupt officials, paying lookouts, and controlling cartel assassins," there was no evidence that Cano-Flores actually did anything as a "plaza boss" other than keep tabs on the traffic coming through the area and, of course, keeping accounts and transmitting the money to

_____

[19]    The government suggested the importance of Los Guerra lay in its location on the banks of the Rio Grande river.  The importance of a ***single*** crossing point on the 1254 mile Texas-Mexico border should not be exaggerated; elsewhere on the border are numerous bridges for vehicle traffic suitable for larger loads of drugs.

46

the leadership.  The captured spreadsheet showed Cano-Flores had one "operative" (listed as "El Teniente" which means "lieutenant" in Spanish) and six "guardia," literally "guards," under his supervision.  This would be consistent with the testimony of Rejon-Aguilar that Los Guerra came under the direct supervision of the "plaza boss" for the city of Miguel Aleman of which Los Guerra was but one municipality, and likely one of the smallest.  App.635-636.

### 3.    Participation in Drug Trafficking Generally

The recorded calls introduced by the government at trial, as interpreted by its witnesses, support the conclusion that Cano-Flores was involved in many aspects of the Gulf Cartel's drug trafficking activities in the immediate area around Miguel Aleman.  He apparently bought drugs, sold drugs, brokered deals, arranged for the transportation and storage of drugs, provided vehicles, some with hidden compartments, and even provided license plates.  He appeared to have been primarily accountable to Metro Tres for these activities, although there are numerous calls with "R-1" as well.  Naturally, he would also respond to requests from those commanders over Metro Tres.  Rejon-Aguilar described his relationship with Cano-Flores "commander to troop,"  App.616.  and several recordings played at trial indicated Rejon-Aguilar did not even know Cano-Flores' phone number. These activities do not qualify Cano-Flores as a leader within the organization.

47

4.    <u>Earlier Service as a Policeman</u>

In addition to his role with the cartel in Los Guerra and around the border, government's witnesses Hinojosa and Manolo testified that in 2002, before he joined the Gulf Cartel, Cano-Flores had assisted the cartel while serving as a police commander in the city of Toluca in the state of Mexico (the area around Mexico City). The government provided no corroboration for these claims, but even if Cano-Flores did have that role, its impact was minimal.

Hinojosa, not the most reliable witness, made the assertion that Cano-Flores provided security for drug shipments all the way to the border, without giving a single example, but this testimony is simply not plausible. As a state police officer, Cano-Flores only had rights to operate as a policeman within his state; he would not have any authority or jurisdiction in any other state on the way to the United States border.

Manolo testified that he (Manolo) transported a load of marijuana from the State of Guerrero to the border at Miguel Aleman in 2002. His uncorroborated testimony was that, on a single occasion, he met Cano-Flores in the town of Tejupilco and was accompanied to Toluca, a distance of 47 miles, where they parted ways. App.680-682. Cano-Flores merely met him at a gas station and drove him in a police car to another gas station at 2:00 in the morning. Moreover, had Cano-Flores actually been called upon     to do anything on this jaunt (other than

48

bond with Manolo), perhaps his presence might have been of some small assistance to the cartel, but no action was required of him.

Manolo testified that he and Cano-Flores became friends and that, as a police officer, Cano-Flores helped collect some money due the cartel. App.684-685.[20]

>  5.    No Violence

Significantly for sentencing purposes, Cano-Flores was not alleged to have committed any acts of violence. Indeed, in two telephone calls introduced by the government, Cano-Flores was upset and crying about someone informing on an associate . Metro Tres told him to stop crying and said he would take care of it himself  by sending some "sicarios," or hitmen. This strongly implied Cano-Flores was unable to handle the problem either because he lacked the resources or the will to do so.  There is no evidence that Cano-Flores conducted or directed military style operations against rival cartel members or Mexican law enforcement or that he executed or ordered executed anyone for violating cartel policies.  Rejon-Aguilar, no stranger to violence, testified that Cano-Flores was passive, not an

---

[20]  Manolo also testified that he asked Cano-Flores to help him "take away" an arrest warrant for homicide in the State of Mexico that already had been pending against him for ten or twelve years, and he gave Cano-Flores money to pay the secretaries who did the paperwork.  This was clearly a personal favor as the two agreed not to tell anyone in the cartel because the cartel did not permit members to pay for favors asked or done.  App.684; App.692.

aggressive person, and that he had never seen him commit a crime of violence. App.637-638. This is in marked contrast to the trail of bloodshed left by the leaders of the cartel.

### 6. No Wealth

Another aspect that distinguishes Cano-Flores from the leaders of the cartel and related trafficking organizations is the fact that Cano-Flores did not appear to have significantly profited from the trafficking activities. He has no meaningful assets as set forth in the presentence report, nor did the government introduce any evidence of such assets. This is in contrast to cartel leaders who lived lives of luxury. For example, Mamito admitted that he had proceeds of $50,000,000 stashed at his residence in Mexico when arrested. App.616; App.643. Government witness Hinojosa, who headed his own trafficking network, was held accountable for proceeds of at least $3,600,000. Likewise, government witness Manolo headed a trafficking organization which laundered proceeds of over $24,000,000.

### F. **Sentences for Other Cartel Members**

#### 1. Osiel Cardenas-Guillen

Any sentence comparison should start with Osiel Cardenas-Guillen who, prior to his arrest, was the undisputed supreme leader of the entire cartel when it was still combined with Los Zetas. He   was indicted on 22 federal charges in

50

the Southern District of Texas, including murder, drug trafficking, money laundering, and threatening United States agents.   He cooperated with the government, pled guilty to five counts, including the drug trafficking conspiracy, a concurrent money laundering conspiracy and ***three counts of threatening to assault and murder federal agents*** and forfeited $50 million in assets.  FBI Press Release, February 24, 2010, found at http://www.fbi.gov/houston/press-releases/2010/ho022410b.htm.   Despite stating "(k)idnappings, extortion, gun battles in the streets, a desperate economy, innocence lost — that is your legacy to your country, to our communities on both sides of the border, and to society," the judge sentenced him to 25 years in prison.  NEW YORK TIMES, February 25, 2010.

Given the prevalence of former Mexican military and law enforcement members in the cartel, a military analogy is useful. The government acknowledges that the combined cartel had as many as 25,000 members.  App.432.  This is roughly twice the size of an average division in the United States Army.  A division is normally commanded by a two-star general.  If Cano-Flores supervised no more than 7 other persons, that would be equivalent to a squad of soldiers, usually led by a mid-rank sergeant.  Even if he had 30 or 40 workers as alleged by Rejon-Aguilar, that would make him equivalent to a platoon leader, usually a lieutenant.  Appellant fails to understand any rational sense of proportionality whereby a lieutenant who committed no acts of violence would receive a sentence

40% *greater* than the general who was the mastermind for the entire scheme and ordered not only the drug trafficking but also the extreme violence which accompanied it, no matter how helpful the general was later to authorities.

### 2.    Other Codefendants

Most of the other twenty defendants on the indictment, are either in Mexican custody or deceased.  Rejon-Aguilar's case is sealed, but it is hard to imagine that the United States will ask the court to sentence Rejon-Aguilar to *more* than Osiel Cardenas Guillen, despite having personally killed or tortured as many as 30 persons.

The government asserts that Alfonso Lam-Liu pled guilty to the same charge as Cano-Flores, but "did not abuse a position of public trust" justifying a sentence of 235 months App.438; however Lam-Liu was the "plaza boss" of Rio Bravo, a city, not "town," near the border where several major highways converge. Moreover, Lam-Liu has an additional criminal record; he was earlier convicted on immigration charges in the Southern District of Texas on October 6, 2011 and was sentenced to serve 10 months incarceration, with 3 years of supervised release.

### 3.    Individuals Referenced at Trial

Jose Luis del Toro Estrada, known as "Tecnico," is the cooperating witness who swore an affidavit in support of Rejon-Aguilar's extradition.  His indictment in the Southern District of Texas, and the proceedings, are sealed, (08-cr-00616) but

an article in POPULAR SCIENCE, April 2014, *available at* http://www.popsci.com/article/technology/radio-tecnico-how-zetas-cartel-took-over-mexico-walkie-talkies, reports that he served less than four years despite being the person responsible for creating the communications infrastructure for the cartel.

Luis Carlos Beltran-Cristancho, who was announced as a government witness, but did not testify, pled guilty to a narcotics conspiracy as the lead defendant  in an Eastern District of New York case (04-cr-00749), and is a cooperating witness.  According to the government, Beltran is ***not even detained***, although the docket does not indicate that he has been sentenced.

Hinojosa, formerly a corrupt Mexican prosecutor, was also a cartel member. When still the "plaza boss" for Neuvo Leon, he was in charge of Zetas, civilians and the police forces.  App.672-673.  Facing the possibility of life imprisonment, he pled guilty to one count of narcotics conspiracy and one count of money laundering.  He was sentenced to 24 years in prison, despite having earlier lied to government investigators, refused to testify against a relative, and bribed a correctional officer while in jail.  He decided to testify against Cano-Flores in hopes of ***further*** reducing his sentence.

53

Manolo, who also headed a major cross-border drug trafficking organization, which worked closely with the Gulf Cartel, received a sentence of only 10 years, less than a third of Cano-Flores's sentence. App.715.

Indicted codefendants Miguel Angel Trevino-Morales ("40") and Omar Trevino-Morales ("42) are also lead defendants in a Southern District of Texas case based on a 50-page indictment chronicling the activities of Los Zetas hitmen in the Laredo, Texas and Nuevo Laredo, Tamaulipas border areas between 2001 and 2008. A table included in Cano-Flores's sentencing memorandum, App.400-402, summarized the sentences given in the case to date, as well as the maximum sentences faced by the defendants, and the relevant charges. It appears that no one whose offense did not involve murder received more than 25 years.

### G.    Conclusion

Although Cano-Flores never explained his decision to go to trial, Agent Lewis, who first interviewed him in Mexico City prior to his extradition, testified that Cano-Flores stopped talking when asked about the Gulf Cartel and "advised that he did not want to speak with us any further out of fear for safety of his family. App.611. Evidence from the presentence report reveals his parents and siblings still live in Reynosa, Mexico, an area controlled by the cartel. This fact, along with the cartel's well-deserved reputation for violently silencing potential

54

witnesses, ***and their families***, suggests a plausible motive, especially since Cano-Flores never testified and made no efforts at an affirmative defense.[21]

Nonetheless, he acknowledges guilty pleas have value to the criminal justice system and incentives for them may be desirable. Still, persons with a leadership or even managerial role in an international drug conspiracy will receive no real benefit under the sentencing guidelines for acceptance of responsibility, meaning that a sentencing judge must look to the array of factors listed in 18 U.S.C. § 3553(a), including avoiding unwarranted sentencing disparity.

Likewise, there is undeniable value to law enforcement if a defendant cooperates. Such cooperation can help to shut down the criminal activity altogether, *see, United States v. Bras,* 483 F.3d 103, 114 (D.C. Cir. 2007), although such is not the case in Mexico where new leaders, even new cartels, are always ready to step into any leadership vacuum. One would expect the most valuable cooperation to help authorities target ***more culpable*** individuals. (The affidavit prepared by del Toro to obtain the extradition of Zeta commander Rejon-Aguilar is one example.) In Cano-Flores's case, however, government witnesses Hinojosa and Manolo ran their own drug trafficking organizations and testified against Cano-Flores who occasionally ***assisted*** them. Perhaps more egregious,

---

[21] Tragically, Cano-Flores' wife was forcibly kidnapped in Mexico while he was in custody in the United States; her body was found after the trial had concluded.

was the spectacle of Rejon-Aguilar, who controlled Zeta operations for much of the country of Mexico testifying against a plaza boss for a border town of 5,000 people.

Cano-Flores submits that by every objective measure, cartel members starting at the very top, were significantly more culpable, yet received sentences substantially more lenient. The only reason cited by the district judge for the "substantially more punitive" sentence (not life, but for a 41 year old man at time of sentencing, near enough) was Cano-Flores' decision to go trial. Only if relative culpability is irrelevant, can this sentence be anything more than a "trial penalty." If justice is any measure, however, relative culpability must be a consideration. This Court has the power to find the district judge's singular focus on going to trial "unreasonable." Absent reversal of the conviction, it should do so and vacate the sentence.

## V.      THE AMOUNT OF THE FORFEITURE WAS EXCESSIVE

### A.      Introduction

The district judge ordered a forfeiture of 15 *billion* dollars which the government proffered was a "conservative" approximation of the gross receipts of the entire Gulf Cartel/Zetas organization from 2000 through 2010. Cano-Flores objects to this amount on several grounds. First, he asserts that the amount of the forfeiture was incorrectly calculated because Rejon-Aguilar had no personal

knowledge of the quantities of drugs in three of the larger plazas and because it was not limited to amounts reasonably foreseeable to him during his time with the cartel.  As an additional ground, he contends that a forfeiture of $15,000,000,000, which is *7500* times larger than the maximum fine violates the Excessive Fines Clause of the Eighth Amendment.

### B.     Standard of Review

Review of a trial court's factual findings on the amount of the forfeiture is for clear error, its determinations on the reliability of sentencing information are reviewed for abuse of discretion, and its legal conclusions are reviewed *de novo, United States v. Pierre*, 484 F3d 75, 88 (1st Cir. 2007).  Review of whether a forfeiture is constitutionally excessive is *de novo, United States v. Bajakajian,* 524 U.S. 321, 336-337 (1998).

### C.     Calculating the Forfeiture

The government sought to establish the amount of the forfeiture through the testimony of DEA Special Agent Lewis ("Lewis") who, in turn, recounted an interview with Rejon-Aguilar conducted after the trial.  Rejon-Aguilar estimated the quantities of cocaine and marijuana imported to the United States each year and the prices which buyers paid for them in each of seven major "plazas" controlled by the organization: Matamoros, Rio Bravo, Reynosa, Diaz Ordaz, Miguel Aleman, Nuevo Laredo, Piedras Negras and Cuidad Acuna.  (He combined the last

two plazas.)  He attempted to deduct amounts sold by the cartel within Mexico. The government reduced Rejon-Aguilar's estimates to a single document introduced during the forfeiture hearing, App.767-775.

Cano-Flores agrees that one way to measure a forfeiture is to aggregate the total amount of drugs and multiply them by the amount the organization could charge for them, without subtracting expenses and the cost of the drugs.  *United States v. Lizza Industries, Inc.,* 775 F.2d 492 (2nd Cir. 1985).  He also agrees that the calculation need not be exact, *United States v. Roberts,* 660 F.3d 149, 166 (2nd Cir. 2011) and that an "estimate" is acceptable as long as it is "reasonable," *United States v. Treacy,* 639 F.3d 32, 48 (2nd Cir. 2011).  The government's burden of proof is only a preponderance of the evidence, *United States v. Roberts, supra* at 165.  Hearsay is admissible, but it must be "reliable," *United States v. Ali,* 619 F.3d 713, 720 (7th Cir. 2010).  Nonetheless, Cano-Flores poses several objections to the calculation accepted by the district judge.

### 1.    Rejon-Aguilar's Basis of Knowledge

Lewis admitted that Rejon-Aguilar never had any control over three of the major plazas, Matamoros, Rio Bravo, and Reynosa, and there was no evidence that he ever saw their ledgers.  Although Lewis claimed the Rejon-Aguilar was testifying about his personal knowledge, the only explanation he could give was that in 2002 or 2003 Rejon-Aguilar was present when planes with drugs landed in

Matamoros.  App.711-712.  None of this could explain how Rejon-Aguilar would be aware of the amount of drugs being transported through Matamoros during the other years, much less the other two plazas.  Moreover if the planes carried cocaine, it would not provide a basis to estimate the amount of marijuana. Cano-Flores objected to consideration of amounts from the plazas over which Rejon-Aguilar had no control.  App.757.  The district judge overruled this objection, inexplicably finding that Rejon-Aguilar's presence when the planes arrived in Matamoros during 2002 or 2003 gave him sufficient knowledge about other time periods and the other two plazas.  The district judge also found that Rejon-Aguilar "checked the accounts."  App.713.  This last statement as applied to the three plazas in question, however, was clearly erroneous as Lewis testified that he did not know if Rejon-Aguilar had ever looked at the books for those plazas. App.711.

It also appears that Rejon-Aguilar was not clear as to the actual weight of the "tons" of drugs he reported.  Rejon-Aguilar told Lewis a ton translated into 1,000 kilograms, but a kilogram is approximately 2.2 pounds, which means that the normal 2,000 pound ton contains only 909 kilograms, not 1,000, a difference of nearly 10% per ton.  Lewis admitted he did not know which "ton" Rejon-Aguilar was using.  App.708.  In the absence of any evidence that the cartel used a ton as a term of art in contrast to its accepted meaning, the likelihood is that Rejon-Aguilar

simply did not know the accurate measure of a ton. Thus the amounts for all the plazas should be reduced by 9% in any event.

### 2.    Cano-Flores' Individual Role

The government, and the district judge, apparently believe that one convicted of a conspiracy is jointly and severally liable for the complete amount that everyone connected with the conspiracy might forfeit. Cano-Flores disagrees. It is true that a defendant may be held jointly and severally liable for the amount to be forfeited, *United States v. Pitt,* 193 F.3d 751, 765 (3rd Cir. 1999), but that does not answer the question as what that amount might be for an individual defendant. While recognizing a coconspirator's liability for the ***foreseeable*** actions of his coconspirators can ***expand*** the liability of that conspirator, such principle also acts as a ***limiting*** factor for coconspirator is not held liable for acts which were unforeseen. *See, United States v. Hurley,* 63 F.3d 1, 22-23 (1st Cir. 1995) *cert. denied* 517 U.S. 1105 (1996) (laundered funds obtained by other members of the conspiracy attributed only to the extent they were foreseeable); *accord, United States v. Simmons,* 154 F.3d 765, 770 (8th Cir. 1998) (forseeability standard for forfeiture in accord with traditional rules with respect to conspiracy). *See also, United States v. DeFries,* 909 F.Supp.13, 20 (D.D.C. 1995) (two codefendants not liable for other defendants severance payments when they had no hand in bestowing them or even were aware of them.)

Under this principle, Cano-Flores may have been liable for an extensive forfeiture of gross receipts in the area around Miguel Aleman where he worked, but not plazas in other parts of Mexico. Moreover, there was no evidence that Cano-Flores became a member of the cartel until at least 2005. He should not be responsible for gross receipts prior to that date. *See, United States v. Capoccia,* 503 F.3d 103, 115 (2nd Cir. 2007) (defendant not liable for funds transferred before offense conduct.) Finally, Cano-Flores would point out that he was arrested in June of 2009, and no longer part of the charged conspiracy. He asserts he should not be liable for any gross receipts after that date.

For all these reasons, Cano-Flores submits that his case should be remanded for a new calculation of the amount of forfeiture. These are not the only claims he makes however; he also claims the matter must be remanded for consideration of his Eighth Amendment claim.

### D.     The Forfeiture Violated the Eighth Amendment

Forfeitures imposed as part of a criminal sentence are intended as punishment and thus, are subject to the Excessive Fine Clause of the Eighth Amendment which bars the imposition of "excessive fines." *United States v. Bajakajian, supra* at 327-328. The Second Circuit has extracted four factors from the *Bajakajian* opinion to consider in determining whether the forfeiture was excessive:

61

> [1] "the essence of the crime" of the [defendant] and its relation to other criminal activity, [2] whether the [defendant] fit into the class of persons for whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the [defendant's] conduct.

*United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009). The court in *Varrone* remanded to the district court to consider the four factors, noting that the forfeiture was 40 times the maximum fine. This factor is more dramatic in Cano-Flores' case, where the forfeiture of $15,000,000,000 is ***7500 times*** the maximum fine of $2,000,000 for a violation of 21 U.S.C §841(b)(1)(A).

Because the Eighth Amendment is a personal right, Cano-Flores contends that the evaluation of the other three *Bajakajian* factors much be evaluated from Cano-Flores' individual perspective, not the entire joint cartels. In this regard the arguments made in Section IV *supra* concerning the reasonableness of his sentence are appropriate here. For example, Osiel Cardenas-Guillen, the cartel's head received a forfeiture of only $50,000,000, 1/300th of $15,000,000,000, an amount he paid! While Cano-Flores's involvement with a major drug trafficking organization certainly would merit a significant forfeiture, it is "excessive" to hold him liable for the actions of up to 25,000 individuals, spread across an entire nation, over a 10 year period. Therefore, Cano-Flores submits that this Court should vacate the forfeiture and remand for a correctly calculated, constitutionally valid one.

## CONCLUSION

For the foregoing reasons, Cano-Flores requests that his conviction entered by the district court be reversed, his sentence and money judgment be vacated, and his case be remanded for further proceedings as appropriate.

## REQUEST FOR ORAL ARGUMENT

Appellant Aurelio Cano-Flores respectfully requests that the Court grant oral argument in his appeal.

Respectfully submitted

_____/s/_____.

Richard K. Gilbert
D.C. Bar. No. 939884
601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, D.C.  20004
(202) 898-0857
rkgesq@juno.com

Kristen Grim Hughes
D.C. Bar No. 456171
1390 Chain Bridge Road, #530
McLean, Virginia  22101
(703) 798-4444
kghughes@hotmail.com

*Attorneys for Appellant Aurelio Cano-Flores*
*Appointed by the Court*

63

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

I hereby certify that this brief complies with the type-volume limitation set forth in Fed.R.App.P. 32(a)(7)(B) because it contains 13,907 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally space typeface using Microsoft Word in 14-point Times New Roman font.

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing Brief For Appellant And Appendix through the Electronic Case Filing system on Ms. Nina Goodman of the Appellate Section, Criminal Division, Department of Justice, this 15th day of April, 2014. **Note: Sealed Appendix will be filed separately, <u>not</u> through Electronic Case Filing system.**

/s/

Kristen Grim Hughes

64

## ADDENDUM TO THE BRIEF
## STATUTES

### 18 U.S.C.A. § 2

**(a)** Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
**(b)** Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

### 18 U.S.C.A. § 2510

As used in this chapter—

...

**(4)** "intercept" means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.[1]

### 18 U.S.C.A. § 2518

**(10)(a)** Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—
    **(i)** the communication was unlawfully intercepted;
    **(ii)** the order of authorization or approval under which it was intercepted is insufficient on its face; or
    **(iii)** the interception was not made in conformity with the order of authorization or approval.

65

Such motion shall be made before the trial, hearing, or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. The judge, upon the filing of such motion by the aggrieved person, may in his discretion make available to the aggrieved person or his counsel for inspection such portions of the intercepted communication or evidence derived therefrom as the judge determines to be in the interests of justice.

## 18 U.S.C.A. § 3231

The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States. Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.

## 18 U.S.C.A. § 3553

**(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

    **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

    **(2)** the need for the sentence imposed--

        **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        **(B)** to afford adequate deterrence to criminal conduct;

        **(C)** to protect the public from further crimes of the defendant; and

        **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    **(3)** the kinds of sentences available;

    **(4)** the kinds of sentence and the sentencing range established for--

        **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.[1]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

**...**

**(e) Limited authority to impose a sentence below a statutory minimum.**--Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

# 18 U.S.C.A. § 3742

 **(a) Appeal by a defendant.**--A defendant may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence--

**(1)** was imposed in violation of law;

**(2)** was imposed as a result of an incorrect application of the sentencing guidelines; or

**(3)** is greater than the sentence specified in the applicable guideline range to the extent that the sentence includes a greater fine or term of imprisonment, probation, or supervised release than the maximum established in the guideline range, or includes a more limiting condition of probation or supervised release under section 3563(b)(6) or (b)(11) than the maximum established in the guideline range; or

**(4)** was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable.

# 21 U.S.C.A. § 841 - Prohibited acts A

 (a) Unlawful acts

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--

**(1)** to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

**(2)** to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

(b) Penalties

Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:

**(1)(A)** In the case of a violation of subsection (a) of this section involving--

**...**

**(ii)** 5 kilograms or more of a mixture or substance containing a detectable amount of--

**(I)** coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

**(II)** cocaine, its salts, optical and geometric isomers, and salts of isomers;

68

          **(III)** ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

          **(IV)** any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

          **(iii)** 280 grams or more of a mixture or substance described in clause (ii) which contains cocaine base;

…

          **(vii)** 1000 kilograms or more of a mixture or substance containing a detectable amount of marihuana, or 1,000 or more marihuana plants regardless of weight; or

…

such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $10,000,000 if the defendant is an individual or $50,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $20,000,000 if the defendant is an individual or $75,000,000 if the defendant is other than an individual, or both. If any person commits a violation of this subparagraph or of section 849, 859, 860, or 861 of this title after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence. Notwithstanding section 3583 of Title 18, any sentence under this subparagraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

69

# 21 U.S.C.A. § 959

 **(a)** Manufacture or distribution for purpose of unlawful importation
It shall be unlawful for any person to manufacture or distribute a controlled substance in schedule I or II or flunitrazepam or listed chemical--

    **(1)** intending that such substance or chemical will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States; or

    **(2)** knowing that such substance or chemical will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States.

**(b)** Possession, manufacture, or distribution by person on board aircraft
It shall be unlawful for any United States citizen on board any aircraft, or any person on board an aircraft owned by a United States citizen or registered in the United States, to--

    **(1)** manufacture or distribute a controlled substance or listed chemical; or

    **(2)** possess a controlled substance or listed chemical with intent to distribute.

**(c)** Acts committed outside territorial jurisdiction of United States; venue
This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States. Any person who violates this section shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia.

# 21 U.S.C.A. § 960

**(a)** Unlawful acts
Any person who--

    **(1)** contrary to section 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance,

    **(2)** contrary to section 955 of this title, knowingly or intentionally brings or possesses on board a vessel, aircraft, or vehicle a controlled substance, or

    **(3)** contrary to section 959 of this title, manufactures, possesses with intent to distribute, or distributes a controlled substance,

shall be punished as provided in subsection (b) of this section.

**(b)** Penalties

    **(1)** In the case of a violation of subsection (a) of this section involving—

…

     **(B)** 5 kilograms or more of a mixture or substance containing a detectable amount of--

      **(i)** coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

      **(ii)** cocaine, its salts, optical and geometric isomers, and salts or isomers;

      **(iii)** ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

      **(iv)** any compound, mixture, or preparation which contains any quantity of any of the substances referred to in clauses (i) through (iii);

•••

     **(G)** 1000 kilograms or more of a mixture or substance containing a detectable amount of marihuana; or

the person committing such violation shall be sentenced to a term of imprisonment of not less than 10 years and not more than life and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than 20 years and not more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $10,000,000 if the defendant is an individual or $50,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not less than 20 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $20,000,000 if the defendant is an individual or $75,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment.

71

Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this paragraph. No person sentenced under this paragraph shall be eligible for parole during the term of imprisonment imposed therein.

## 21 U.S.C.A. § 963

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## 28 U.S.C.A. § 1291

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## United States Sentencing Guidelines Provisions

§ 2D1.1. Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy

**(a)** Base Offense Level (Apply the greatest):

•••

**(5)** The offense level specified in the Drug Quantity Table set forth in subsection (c), except that if (A) the defendant receives an adjustment under § 3B1.2 (Mitigating Role); and (B) the base offense level under subsection (c) is (i) level 32, decrease by 2 levels; (ii) level 34 or level 36, decrease by 3 levels; or (iii) level 38, decrease by 4 levels. If the resulting offense level is greater than level 32 and the defendant receives the 4-level ("minimal participant") reduction in § 3B1.2(a), decrease to level 32.

**(b)** Specific Offense Characteristics

**(1)** If a dangerous weapon (including a firearm) was possessed, increase by 2 levels.

**(2)** If the defendant used violence, made a credible threat to use violence, or directed the use of violence, increase by 2 levels.

**(3)** If the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance, (B) a submersible vessel or semi-submersible vessel as described in 18 U.S.C. 2285 was used, or (C) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance, increase by 2 levels. If the resulting offense level is less than level 26, increase to level 26.

**(4)** If the object of the offense was the distribution of a controlled substance in a prison, correctional facility, or detention facility, increase by 2 levels.

•••

**(11)** If the defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense, increase by 2 levels.

**(12)** If the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels.

73

...

**(14)** If the defendant receives an adjustment under § 3B1.1 (Aggravating Role) and the offense involved 1 or more of the following factors:

       **(A)(i)** The defendant used fear, impulse, friendship, affection, or some combination thereof to involve another individual in the illegal purchase, sale, transport, or storage of controlled substances, (ii) the individual received little or no compensation from the illegal purchase, sale, transport, or storage of controlled substances, and (iii) the individual had minimal knowledge of the scope and structure of the enterprise;

       **(B)** The defendant, knowing that an individual was (i) less than 18 years of age, (ii) 65 or more years of age, (iii) pregnant, or (iv) unusually vulnerable due to physical or mental condition or otherwise particularly susceptible to the criminal conduct, distributed a controlled substance to that individual or involved that individual in the offense;

       **(C)** The defendant was directly involved in the importation of a controlled substance;

       **(D)** The defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense;

       **(E)** The defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood,
Increase by 2 levels.

...

## (c) DRUG QUANTITY TABLE

| Controlled Substances and Quantity* | Base Offense Level |
|---|---|
| **(1)** 30 KG or more of Heroin; 150 KG or more of Cocaine; ... 30,000 KG or more of Marihuana; | **Level 38** |

# § 3B1.1, Aggravating Role

Based on the defendant's role in the offense, increase the offense level as follows:

   **(a)** If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

   **(b)** If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

   **(c)** If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.


# 3B1.3, Abuse of Position of Trust or Use of Special Skill

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).


# § 3E1.1. Acceptance of Responsibility

 **(a)** If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

**(b)** If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

## § 5K1.1. Substantial Assistance to Authorities (Policy Statement)

Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

**(a)** The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

**(1)** the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

**(2)** the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

**(3)** the nature and extent of the defendant's assistance;

**(4)** any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

**(5)** the timeliness of the defendant's assistance.